**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GEORGE RIVERA,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 08 C 4382** |
| | ) | |
| **MARCUS HARDY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY,  District Judge:

In May 2004, an Illinois jury convicted George Rivera of first degree murder, aggravated vehicular hijacking, and five counts of armed robbery.  The trial judge sentenced Rivera to fifty-five years of imprisonment on the murder charge to be served concurrently with six concurrent ten-year prison terms on the vehicular hijacking and armed robbery charges.  Rivera now petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, the Court denies Rivera's petition.

**Background**

**A.    State court trial**

State court factual findings are presumed correct in a federal habeas corpus proceeding unless they are rebutted by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *Mahaffey v. Schomig*, 294 F.3d 907, 915 (7th Cir. 2005).  Because Rivera has not rebutted the Illinois Appellate Court's factual findings with clear and convincing

evidence, the Court adopts the following account from the decision of that court in

*People v. Rivera*, No. 1-04-2164, slip op. (Ill. App. Nov. 16, 2006):

> On February 13, 2000, Frederick Jamison (Frederick) was fatally shot in the head in connection with a faked drug transaction and arranged robbery. In the transaction, known as a "lick," defendants lured Frederick and others to a specified location on the premise of selling them a large quantity of marijuana and then robbed Frederick and the others of the money while pretending to be police officers. [Rivera] was arrested on February 15, 2000, and charged in a 38-count indictment for felony-murder based on aggravated vehicular hijacking and felony-murder based on armed robbery; and also with five counts for the armed robbery and aggravated vehicular hijacking of Roderick Jamison, Corey Brown, John Smith, Jonathan Stevenson, and Leroy Presley. Numerous co-defendants were also charged.

> At trial, Roderick Jamison (Roderick) testified on behalf of the State that on the night of February 13, 2000, at approximately 8 p.m., he and his brother Frederick, received a phone call regarding the purchase of 40 pounds of marijuana. Roderick and Frederick and their friends Brown, Smith, Stevenson and Presley, drove to Cristo's Alarm Shop, an automobile repair facility in two vehicles. Frederick brought $28,000 cash and drove his white Ford Expedition SUV to the back of the shop, exiting the vehicle to speak with co-defendant Alvarez who was waiting in the garage.

> As Roderick and the others awaited delivery of the marijuana, a Hispanic man with long hair, carrying a bag in his hand entered the shop and spoke with Alvarez (a/k/a "Cristo"). The Hispanic man and Alvarez went into a back room and then the Hispanic man emerged a minute later. The Hispanic man left the building through the garage but returned four to five seconds later, along with four or five gunmen carrying automatic weapons. One of the gunmen, later identified as [Rivera], yelled, "Police, freeze, everybody get down!" Roderick stated that none of the gunmen wore police uniforms, bullet-proof vests or badges. The gunmen ordered Frederick and his friends to lay on the ground and robbed them while [Rivera] jumped into Frederick's Expedition and backed it out of the garage. Alvarez and the long-haired man who brought the bag, later identified as co-defendant Martinez, were also forced to the floor.

> The gunmen searched for money but could not find it. Harris told Roderick to stand up, placed a gun in Roderick's mouth and demanded to know the whereabouts of the money. Harris stated: "These bitch ass niggers don't want to play. I want the money or he gonna die." Smith jumped up and stated: "I'll take you where all the money, I'll take you where all the money." One of the gunmen walked Smith out of the garage. At the same time, the other co-defendants were beating and kicking Jamison and his friends. After a while,

Smith returned to the garage and someone yelled, "We got it, we got it. Let's go, let's go." As the gunmen left the garage, codefendants Taylor and Harris fired their guns hitting Frederick in the head. After the gunmen left, Roderick called 911 and the others began beating Alvarez and Martinez, believing them to be a part of the robbery scheme. The police arrived and transported everyone present to the police station in police vehicles.

On cross-examination, Roderick stated that when he initially spoke to the police, he did not admit that he and his friends intended to purchase marijuana, but two hours later he finally told the police about the plan. Roderick described [Rivera] as a man who had a "funny, little face," with high cheek bones and a "funny smirk" upon entering the garage. According to Roderick, [Rivera] was in the garage for approximately five minutes before getting into Frederick's Expedition and driving away.

Jonathan Stevenson testified that he was with Frederick, Roderick and the others when they went to the shop, riding in Frederick's Expedition. Upon arrival, Frederick pulled the Expedition into the garage and got out, but Stevenson stayed in the truck for about a half-hour longer watching the All-Star game on the television in the vehicle with the others. Suddenly they heard someone say, "Freeze, Police!" Stevenson and the others were forced out of the Expedition by [Rivera], armed with an automatic weapon, and told to lay face down on the ground. One of the gunmen took Stevenson's wallet and money while other gunmen robbed Stevenson's friends. Stevenson was on the ground for about thirty minutes. During that time, someone got into the Expedition and drove it off. As the gunmen were leaving, he heard someone state, "I'm gonna make an example of these guys," and then he heard gun shots ring out. When he looked up, Frederick lay bleeding on the ground. The next day, Stevenson identified co-defendant Taylor in a police lineup.

On cross-examination, Stevenson admitted that he had three prior convictions for delivery of a controlled substance, burglary and possession of a controlled substance with intent to deliver. Stevenson denied knowledge that a marijuana purchase was to occur at the alarm shop. Stevenson stated that he did not go to the police station immediately following the shooting because he wanted to see Frederick at the hospital. Stevenson stated that he went to the police station after one of Brown's friends told him to go. Stevenson did not identify [Rivera] as one of the gunmen.

Leroy Presley Jr., testified that he and Frederick were friends since childhood and that they were together on February 13, 2000. Presley acknowledged that he was convicted of possession of a controlled substance in 1994, and of possession of cannabis with intent to deliver in 2003. Presley stated that he was with Frederick and the others when they decided to go to Cristo's. Presley drove to the shop in his 1994 Buick Regal accompanied by Roderick. Upon arrival,

Presley entered the shop to purchase a Fix-A-Flat for a flat tire. Upon his exit, Presley saw that Frederick's Expedition was in the garage and that two of his friends were sitting in the truck watching television. Presley testified that everyone was waiting to purchase marijuana. While they were waiting, a Mexican man with long hair (co-defendant Martinez) entered the shop holding a red duffel bag, and walked into the back office. After a while, Martinez emerged without the bag, walked out of the front door, and then returned a second later with a group of other men. The men that entered the shop screamed, "We the police. Get on the floor." All of the men were armed. Presley described the gunmen as "light skinned guy with freckles; a dark skinned guy with braids * * * a brown skinned kind of Hispanic that looked black [and] a light skinned Mexican."

In court, Presley identified [Rivera] as one of the gunmen. Presley stated that the gunmen forced him and his friends to the ground, then [Rivera] got into Frederick's Expedition and drove off. At the same time, the other gunmen demanded to know where the money was and Presley and his friends responded that the money was in the truck. Co-defendant Taylor forced Roderick to stand up and take off his clothes. Roderick began to take off his shirt and pants when somebody knocked on the door and stated, "we got it." The gunmen forced Presley and his friends to stand up and face the wall, their backs to the gunmen. Someone turned off the lights and one of the gunmen fired a shot. Presley saw that Frederick was on the ground and had been shot. Presley stated that the entire incident took approximately 35-40 minutes and that the gunmen were in the garage for approximately 20-30 minutes.

On cross-examination, Presley admitted that he knew of the intent to purchase marijuana at the shop. Presley stated that [Rivera] was the first gunman to enter the shop and that [Rivera] pulled Stevenson and Brown out of the Expedition. [Rivera] was in the garage for approximately five minutes prior to taking the truck. Presley stated that the money for the marijuana purchase was under the seat when [Rivera] took the truck.

Corey Brown testified that he was a passenger in the Expedition when the gunmen entered the garage. Stevenson was in the truck watching the All Stars game on television with Brown. Brown stated that he was hit by a "white Hispanic," whom he later identified as [Rivera], and told to get on the ground. Brown remained on the ground for approximately 20-30 minutes while a "light-skinned black" with freckles took his ID and money out of his pocket. Brown stated that the "white Hispanic" who forced him out of the truck drove it out of the garage, while the other gunmen repeatedly asked everyone to reveal the location of the money for the marijuana sale. After a short time, a man entered the garage and said they found the money and the gunmen began to retreat out of the garage. Brown and his friends were told to stand against the wall of the garage and the gunmen fired shots at them.

Following the incident, Brown viewed a line-up at the police station and identified co-defendant Taylor as one of the gunmen who took his identification and money. Brown acknowledged that he had been convicted of possession of a controlled substance in 1994.

On cross-examination, Brown denied prior knowledge that Frederick was going to purchase marijuana at the shop. Brown stated that he learned about the drug transaction later that night, after the shooting occurred. Brown further stated that the Hispanic man who forced him out of the [E]xpedition hit him "upside the head," and told him to get down on the ground.

John Smith testified that he went to the alarm shop along with Frederick and his friends so that Frederick could purchase some marijuana. While awaiting delivery of the marijuana, four men rushed into the garage yelling that they were the police and telling everyone to get on the ground. All of the men were holding guns. [Rivera] ran into the garage ahead of the others, grabbed Brown and Stevenson out of the truck, jumped into the truck and drove it out of the garage. The other three gunmen robbed and beat Stevenson and his friends and forced Roderick to stand up and take off his clothes. Smith heard one of the defendants say: "we fittin' to kill 'em if they don't give us this money." At that point, Smith stood up and told them that the money was inside the truck. Co-defendant Taylor walked Smith outside to try to find the money. Once outside, they noticed that the truck was already gone. Smith returned to the garage and was forced to stand against the wall. One gunman, later identified as Roman, turned off the light in the garage and fired a shot, hitting Frederick. After the gunmen left, Smith began to beat up Martinez because he believed Martinez knew the gunmen and was part of the robbery plot.

Smith identified [Rivera] and co-defendants Roman and Taylor from a police line up. Smith acknowledged a prior conviction for manufacture and delivery of a controlled substance in 1998, unlawful use of a weapon by a felon in 2000, and that he had a pending felony case in Kane County.

On cross-examination, Smith stated that his phone and some money were taken from him. Smith also stated that Roderick told him to tell the truth about what happened because Frederick was dead.

Jason Rickard was called to testify on behalf of the state but invoked his fifth amendment right against self incrimination. In response, the trial court stated:

> "Mr. Rickard, the Fifth Amendment right is not something you can just will-nilly invoke, there has to be a reason to invoke it, and the State's position is and from what I know of this case is you don't have a right to a Fifth Amendment on this case. State is not going to ask you anything that you have not previously testified to in front of a Grand Jury."

The trial court then assigned an assistant public defender to speak to Rickard regarding his right against self-incrimination and to discuss any further concerns Rickard had about testifying at trial. Rickard's testimony was postponed pending review of the grand jury transcript and Rickard's prior written statement.

Chicago Police Department forensic investigator, John Paulson, testified on behalf of the State that he photographed the area around Cristo's Alarm shop and the Ford Expedition truck. Paulson stated that he was unable to find any suitable fingerprint impressions on the car. On cross-examination, Paulson stated that there were no impressions anywhere on the exterior of the car, including the glass, the door, the door handles or the hood of the car.

Chicago police Detective Thomas Flaherty testified that he investigated the crime scene, then went to the hospital where he learned that Frederick died from gunshot wounds. Detective Flaherty located and interviewed codefendant Martinez, and noticed that Martinez had multiple bruises and abrasions around his face and head. The next day, Detective Flaherty learned that [Rivera], Taylor, and Roman were suspects in the case.

Detective Flaherty stated that Roderick and Smith identified [Rivera] [in] a police line up, but that Presley, Brown and Stevenson did not identify anyone from that line up. On cross-examination, Detective Flaherty stated that when he initially interviewed the victims, they did not inform him that the incident involved a drug transaction.

Cook County Medical Examiner Mitra Kalelkar, a forensic pathologist, testified that she conducted an autopsy of Frederick Jamison and determined his cause of death was a gunshot would to the face involving the heart and lung. The examination did not reveal that the body had been kicked, bruised or hit by a blunt instrument. Dr. Kalelkar noted that the body tested positive for a .012 level of alcohol.

The trial court then ordered Rickard to testify over defense counsel's objection. In order to avoid charges of contempt of court, Rickard agreed to testify. Rickard testified he lived with [Rivera] for four months prior to the robbery in February 2000. Rickard stated that he knew co-defendant Roman from the neighborhood. On February 13, 2000, Rickard, Taylor and Guevara got together and discussed a robbery. Rickard denied that the conversation concerned a "fake drug deal," despite the fact that Rickard had previously admitted that [Rivera] and Taylor told Rickard they planned a "lick," a street term for obtaining money.

The State used Rickard's prior statement to impeach him. The statement is as follows: Rickard admitted that he knew about the robbery plan and that after hearing about it, he drove around with [Rivera], Taylor and Guevara. The group drove to 22nd Place and Cermak Avenue, a location where Taylor told them to

go. Rickard stated that they wanted to look at a restaurant to see where Guevara "was going to set up the fake drug deal." After looking at a restaurant in front of the alarm shop, Rickard and [Rivera] went to [Rivera]'s mother's house. Co-defendant Roman pulled up in his car and they continued to talk about the robbery plan.

Rickard's statement further provided that the robbery was set for 6 p.m. at a garage located behind a restaurant. When Guevara first explained the details of the robbery, Rickard asked if anyone had any guns. Guevara told the others that he located some guns for everyone. The plan was for Guevara and [Rivera] to meet some men at the restaurant and talk to them. Rickard was supposed to sit in the car and wait for the others to give him the robbery proceeds, then Rickard was to drive away. Taylor told Rickard that he would be compensated for his role in the robbery. Rickard told Guevara that if the robbery did not begin soon, he would have to leave because he had plans to see *Disney on Ice* with his girlfriend that evening.

On cross-examination, Rickard testified that after the robbery he was taken to the police station and placed in an interrogation room. Richard told police officers that he did not know anything about a "lick" and he denied that he ever met with co-defendant Roman that day. Rickard stated that he was told what to say in his statement by the officers, and that he was threatened into giving a statement. Rickard denied the truthfulness of his statement. Rickard admitted that on February 22, 2000, detectives picked him up at his house and brought him to the courthouse to testify before the grand jury. Rickard stated that he was threatened into testifying and that he was scared at the time he signed his statement.

On re-direct, Rickard admitted that at the time he gave his statement to police officers and an Assistant States [sic] Attorney (ASA), defendants were in custody and not present in the room. Neither were defendants present at the time Rickard testified before the grand jury. Rickard stated that he was at the police station for a "long" time, but the State impeached Rickard on this issue with his prior testimony that the detectives picked him up at 10 a.m. and he signed the statement at 11:30 a.m. Rickard denied that he told anyone any times.

ASA Margaret Wood testified that in early February 2000, she interviewed Rickard at approximately 10:30 a.m. in a large "roll call" room at Area 4 Police headquarters, rather than a small interrogation room. Chicago Police Sergeant Brian Holy was also present in the room. ASA Wood identified herself to Rickard as a lawyer and a prosecutor and explained that she was not his lawyer. Rickard answered all of her questions about the robbery in about 30-45 minutes. ASA Wood explained to Rickard that she would transcribe his oral statement and leave it for him to read through and check for accuracy. ASA Wood asked Sergeant Holy to leave the room once Rickard agreed to the handwritten

statement. ASA Wood then asked Rickard whether he had any complaints about his treatment and he stated that he had none; he received drinks and cigarettes. ASA Wood wrote out Rickard's statement in narrative form and, as promised, gave it to him to check for accuracy, telling Rickard: "cross out whatever is wrong and write what it should say."

ASA Wood read Rickard's statement into evidence. Rickard stated as follows: On February 13, 2000, Rickard met with [Rivera] and "Red" (a/k/a co-defendant Taylor). Red told him he had a "lick." Rickard drove his car while Red tried to get a hold of "Dave." While driving, Red and [Rivera] asked Rickard if he wanted to have a part in the lick and told him he would get some money. The group met up with Dave and Dave got into the car and began to talk about "what was going to happen." Dave asked Rickard, Red and [Rivera] if they had any guns. Red replied that he had a gun while Rickard and [Rivera] stated they did not have any guns. Dave told the others he would supply them with some guns and that the lick was "going down" behind a restaurant. Dave left to go get his gun and Rickard continued to drive to the restaurant. As he pulled up to the restaurant, Dave pulled in after him. Red promised Rickard $3000 to $5000 for driving everyone to the lick and then driving away after the lick. Rickard told Dave he had to go soon because he had plans with his girlfriend to see *Disney on Ice*.

Rickard and [Rivera] drove to [Rivera]'s mother's house where they met with "Junito" and Red and discussed the specifics of the robbery plan. [Rivera], Red, Dave and Junito were going to run up with guns after the "black guys" pulled up behind the restaurant. Rickard was to wait for the others in the car; [Rivera] was going to be standing at the scene pretending to do the fake drug deal. Rickard told Red he could not take part in the lick because he had to go meet his girlfriend. Rickard left and did not see anyone until the following day.

The next morning, Rickard saw [Rivera]. [Rivera] asked Rickard to take him shopping. [Rivera] had money and Rickard "figured the lick had gone down." [Rivera] bought himself some new clothes and shoes and bought Rickard a new shirt and jeans. Rickard thought [Rivera] also bought something for his girlfriend. Rickard added a sentence to this written statement: "I think [Rivera] bought the Valentines' gifts Sunday night." Rickard stated that the police came to get him at 10 a.m. at his girlfriend's house and that he agreed to come to the police station. He was given pop to drink and was allowed to smoke cigarettes. Rickard was not threatened in exchange for his statement and he gave his statement freely and voluntarily.

On cross-examination, ASA Wood stated that she was not present for any conversations Rickard may have had with police officers prior to her arrival. While ASA Wood wrote out Rickard's statement for him, the statement contains some additional words written by Rickard and is initialed by Rickard in various places.

Sergeant Brian Holy testified that he brought Rickard to the police station but told him that he was not under arrest. Sergeant Holy never threatened Rickard or told him he would be charged with murder and armed robbery. Sergeant Holy was present in the interview room when ASA Wood interviewed Rickard. ASA Wood asked him to leave at one point, and when he returned, ASA Wood transcribed Rickard's oral statement.

ASA Holly Rappin testified that on February 22, 2000, she explained the grand jury process to Rickard before he testified. At the grand jury hearing, ASA Rappin questioned Rickard about the events that occurred on the night of the robbery. Rickard explained that Red invited him to participate in exchange for monetary compensation. Rickard testimony [sic] reflected the facts in his written statement. Rappin further questioned Rickard about his statement, showed him the statement and asked him whether it was a "true and accurate copy." Rickard responded, "it looks like it, yes." Rickard also acknowledged that he voluntarily signed each and every page of the statement.

On cross-examination, ASA Rappin stated that she spoke to Rickard before he testified and that she questioned him about his treatment by the police. She further stated that Rickard was not represented by counsel at the grand jury because he was called as a witness.

Chicago Police Detective George Tracy testified that he located and arrested [Rivera] and co-defendant Roman and brought them to the police station. Detective Tracy and Detectives Duffin and Marszalek met with [Rivera] in one of the interview rooms and advised him of his Miranda rights. [Rivera] told the detectives that Taylor and Guevara approached him with a proposition of robbing some "black dope dealers." [Rivera] stated that he agreed to participate in the crime and offered to supply another man, Rickard, to assist with the crime. Codefendants Taylor and Guevara also stated that they knew others who could help. [Petitioner] stated that they decided the robbery would occur on February 13. [Rivera], Rickard, Guevara, Martinez, Taylor and Alvarez met and discussed the specifics of the crime; they would wait outside the vicinity of the alarm shop for the victims and wait for someone in the shop to call and say that the money had arrived.

[Rivera] told the detectives that when [he] arrived at the alarm shop, all of the victims were lying on the floor. [Rivera] got into Frederick's Expedition and drove it from the shop. [Rivera] proceeded to park the truck near 52nd and Hermitage, approximately one block from his house, then walked back to his second floor apartment to wait for the rest of the group. A short while later, codefendants Taylor, Roman, Harris and Guevara came to [petitioner's] apartment and Guevara informed [Rivera] that the money was in the Expedition. [Rivera] and Harris searched the Expedition and found 23 bundles of cash each consisting of $1000. The money was divided and [Rivera] received $2000 for his role.

ASA Tim Carter testified that he interviewed [Rivera] after advising him of his Miranda rights. [Rivera] stated that Guevara approached him and Taylor about a plan to commit a robbery during a drug transaction. [Rivera] agreed to the plan and Guevara handed him a handgun. [Rivera] stated that the plan called for Martinez to enter the alarm shop with a bag to "make it look like a dope deal," and that the rest of the men would go inside and "make it look like a robbery." [Rivera] and the others went to the restaurant located in front of the alarm shop and waited for Martinez to go inside. However, the group received a call from Guevara telling them that six black men had shown up and that he was going to get two additional guys to assist with the robbery. Shortly after that, two "black guys showed up."

Martinez entered the alarm shop and the rest of the men followed him. They all had guns. Taylor and one of the black men started taking wallets, jewelry and coats from the victims while [Rivera] went over to Cristo, who was on the ground, and demanded to know the whereabouts of the money. Cristo pointed to the white Expedition. [Rivera] picked up the bag that Martinez had carried into the alarm shop. [Rivera] did not want the victims to know that no Martinez and Cristo had set them up for the robbery. [Rivera] then got into the Expedition and drove it to the vicinity of 51st and Wood Streets and waited for the others to arrive. While he was waiting, [Rivera] "skimmed" $1000 from the total amount of cash. [Rivera] stated that he went on a spending spree and bought gifts for people, clothes, jewelry and a new transmission for his car.

ASA Carter stated that the interview lasted approximately 30-40 minutes. ASA Carter left the room but later returned to discuss the various options available to [Rivera] to memorialize his statement. ASA Carter informed [Rivera] that he could record it in video form, a court-reported statement, a handwritten statement, or an oral statement. [Rivera] opted to let the statement remain in oral form.

On cross-examination, ASA Carter stated that he did not show [Rivera] any Polaroid photographs of any evidence during the interview, and he did not know whether [Rivera] had been shown photographs by anyone else. ASA Carter testified that [Rivera] told him that after entering the alarm shop he chose to pick up the bag Martinez brought to the shop in order to protect Martinez and Cristo. [Rivera] placed the bag in the Expedition before he drove off. [Rivera] told ASA Carter that he was in the alarm shop for approximately five minutes. ASA Carter further stated that [Rivera] admitted that he was told by Cristo that the money was in the Expedition. ASA Carter did not take notes of the interview nor did he examine [Rivera] to see whether he had any bruises at the time of the interview.

Chicago Police Detective James Adams testified that he met with [Rivera] and ASA Carter at the police station on February 15, 2000 at 3 a.m., and advised [Rivera] of his Miranda rights. At around 11 a.m., Detective Adams and ASA

Carter again advised [Rivera] of his Miranda rights and [Rivera] agreed to talk to ASA Carter. [Rivera] also agreed to give an oral statement. Detective Adams testified to the same essential facts regarding the content of the statement as ASA Carter.

*Rivera I*, slip op. at 2-15.

In closing argument, the prosecution emphasized Rivera's confession and the witness testimony implicating him. To explain Rickard's trial testimony, the prosecution argued that "[Rickard] lied because his friend is looking at him. . . . His friend wasn't there before. So he came in here and said I don't remember." Trial Tr. 1471; *see also id.* 1418-19 ("The defendant wasn't present when [Rickard] gave the statement, ladies and gentlemen. . . . Your common sense tells you that [Rickard] doesn't want to hurt his friend. He realizes that he did, but he told the truth in the statement originally.").

After less than two hours of deliberation, *see id.* 1492, the jury convicted Rivera of first degree murder, aggravated vehicular hijacking, and armed robbery of Presley, Roger Jamison, Brown, Stevenson, and Smith. The murder conviction was based on a felony murder theory.[1] The judge sentenced Rivera to fifty-five years of imprisonment on the murder charge to be served concurrently with six concurrent ten-year prison terms for the hijacking and armed robbery offenses.

## B.  Direct appeal

On appeal, Rivera contended that (1) his armed robbery and aggravated

---

[1] The prosecution pursued two separate counts of first degree murder, the first of which alleged murder during the commission of an aggravated vehicular hijacking (Count Three) and the second of which alleged murder during the commission of an armed robbery (Count Four). After the jury returned a guilty verdict on first degree murder, the trial court concluded that the two counts "would both merge" under Illinois law. Trial Tr. 1499. Reasoning that hijacking constituted a "more serious" predicate felony, the trial court entered final judgment on Count Three but not Count Four. *Id.*

vehicular hijacking convictions did not support felony murder liability, (2) his trial counsel was ineffective for failing to tender an instruction on the duration of an armed robbery, (3) the trial court's failure to issue such an instruction on its own violated due process, (4) the trial court erred in its rulings regarding Jason Rickard, (5) the trial court violated Illinois law by convicting and sentencing Rivera for both felony murder and the predicate felonies, and (6) the trial court violated Rivera's Fourth Amendment rights by ordering DNA testing.

In an order issued on November 16, 2006, the Illinois Appellate Court affirmed Rivera's murder and robbery convictions and sentences. *Rivera I*, slip op. at 1. The court held that the evidence was sufficient to support Rivera's first degree murder conviction; his trial counsel was not ineffective for failing to tender the instruction; Rivera failed to sufficiently develop his due process argument regarding the instruction; the trial court did not abuse its discretion in its evidentiary rulings concerning Rickard; and the court-ordered DNA testing complied with the Fourth Amendment. *Id.* at 16-34. The court agreed with Rivera that his aggravated vehicular hijacking conviction constituted a lesser-included offense of his first degree murder conviction under Illinois law and remanded the case to the trial court to vacate the hijacking conviction and sentence. *Id.* at 32-33.

Rivera filed a petition for rehearing, which the Illinois Appellate Court denied on December 4, 2006. *People v. Rivera*, No. 1-04-2164, slip op. (Ill. App. Dec. 4, 2006). He then filed a petition for leave to appeal, which the Illinois Supreme Court denied on September 26, 2007. *People v. Rivera*, 225 Ill. 2d 666, 875 N.E.2d 1121 (2007). The United States Supreme Court denied his petition for a writ of certiorari on January 7,

2008. *Rivera v. Illinois*, 552 U.S. 1110 (2008).

## C.    Post-conviction petition

Rivera filed a *pro se* post-conviction petition in state court on April 22, 2008.  He argued that his trial counsel was ineffective for failing to object to the introduction of testimony on Rivera's oral confession and failing to investigate and call mitigating witnesses, his appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness on direct appeal, and his indictment was improper.  In support, Rivera attached affidavits from himself and co-defendant Alvin Harris.  On May 30, 2008, the court summarily dismissed the petition.

Rivera appealed.  On January 22, 2010, the Illinois Appellate Court affirmed the dismissal of Rivera's petition and granted his appellate counsel's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 51 (1987).  *People v. Rivera*, No. 1-08-1797, slip op. (Ill. App. Jan. 22, 2010) (*Rivera II*).  Rivera did not petition the Illinois Supreme Court for leave to appeal.

On August 1, 2008, Rivera filed the present petition for a writ of habeas corpus.  He requests an evidentiary hearing to resolve any outstanding factual issues.

## Discussion

A prisoner convicted in state court is entitled to a writ of habeas corpus if he is being held in violation of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may grant a writ of habeas corpus only if the petitioner demonstrates that the state court's decision was "contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1) & (2); *Griffin v. Pierce*, 622 F.3d 831, 841 (7th Cir. 2010).

A decision satisfies the "contrary to" prong of § 2254(d)(1) if, for example, "the state court applies a rule that contradicts the governing law set forth" by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A decision satisfies the "unreasonable application" prong "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case," *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), or "unreasonably refuses to extend a principle to a context in which it should apply." *Griffin*, 622 F.3d at 641 (internal quotation marks and citation omitted). Lastly, a decision involves an unreasonable determination of the facts if the petitioner rebuts the presumption of correctness that applies to state court factual findings by clear and convincing evidence. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

Rivera presents four claims in his petition. First, he challenges his first degree murder conviction on the ground that his armed robbery and aggravated vehicular hijacking convictions did not support felony murder liability. Second, he challenges the trial court's evidentiary rulings regarding Rickard. Third, he contends he was denied effective assistance of counsel at trial on a number of grounds, including his counsel's failure to request a jury instruction regarding the duration of the armed robbery. Finally, he challenges his conviction and sentence as inconsistent with those of his co-

defendants.

## A.     First degree murder conviction

The Court begins with Rivera's argument that his armed robbery and aggravated vehicular hijacking convictions were not proper predicate felonies for felony murder liability.  The evidence at trial indicated that Rivera left the crime scene in the Expedition before Frederick Jamison was murdered.  For that reason, Rivera argues, felony murder based on his participation in the armed robbery impermissibly relies on "accountability" liability.  Likewise, he contends, a murder conviction based on the hijacking offense improperly holds him liable for felony murder based on a felony completed *before* commission of the murder.

As a preliminary matter, the State characterizes Rivera's claim as raising a state law matter not cognizable under section 2254.  The State is correct that a federal court "may not grant habeas relief under 28 U.S.C. § 2254 merely because a state court has misinterpreted or misapplied state law."  *Lopez v. Thurmer*, 594 F.3d 584, 587 (7th Cir. 2010).  Construing Rivera's *pro se* petition liberally, however, as this Court must do, *Coulter v. Gramley*, 93 F.3d 394, 397 (7th Cir. 1996), his claim can be read to challenge the sufficiency of the evidence supporting his conviction.  This is a cognizable Fourteenth Amendment claim.  *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  The Court accordingly considers the claim.

In reviewing a habeas corpus petitioner's claim of insufficient evidence, this Court asks whether, viewing the evidence in the light most favorable to the verdict, "*any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Id.* at 319 (emphasis in original).

Under Illinois law, armed robbery consists of "the taking of property 'from the person or presence of another by the use of force or by threatening the imminent use of force' while 'armed with a dangerous weapon.'" *People v. Dennis*, 181 Ill. 2d 87, 101, 692 N.E.2d 325, 333 (1998) (quoting 720 ILCS 5/18-1, 18-2(a)). "A person commits vehicular hijacking when he or she takes a motor vehicle from the person in the immediate presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-3.

A defendant may be guilty of a crime either as a principal or as one accountable for the criminal conduct of others. *See People v. Calderon*, 369 Ill. App. 3d 221, 235, 859 N.E.2d 1163, 1176 (2006); *People v. Curtis*, 296 Ill. App. 3d 991, 1001, 696 N.E.2d 372, 379 (1998). A person is legally accountable for the conduct of another when, either before or during the commission of an offense, and with the intent to promote or facilitate the offense, he solicits, aids, abets, or agrees or attempts to aid the person in the planning or commission of the offense. *Curtis*, 296 Ill. App. 3d at 1001, 696 N.E.2d at 379 (citing 720 ILCS 5/5-2).

Illinois's felony murder law provides that "[a] person who kills an individual without lawful justification commits first-degree murder if, in performing the acts which cause the death: . . . he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/18-3. "The object of the felony murder statute is to limit the violence that attends the commission of felonies, so that anyone engaging in that violence will be automatically subject to a murder prosecution, should a murder occur

16

during the commission of a felony." *People v. Shaw*, 186 Ill. 2d 301, 322-23, 713
N.E.2d 1161, 1172-73 (1999) (citation omitted).

A principal in an armed robbery is liable for any murder that occurs during the
commission of the armed robbery, even if the principal left the scene prior to the
murder. *People v. Jackson*, 333 Ill. App. 3d 962, 966-68, 777 N.E.2d 626, 631-33
(2002). A robbery is generally complete "when force or threat of force causes the victim
to part with possession or custody of property against his will." *Dennis*, 181 Ill. 2d at
102, 692 N.E.2d at 333 (citation omitted). In the context of felony murder, however, a
murder occurs during the commission of an armed robbery if it occurs in the course of
an escape from the armed robbery. *Id.* at 104, 692 N.E.2d at 334.

The Illinois Appellate Court upheld Rivera's first degree murder conviction on the
ground that both his armed robbery and aggravated vehicular hijacking convictions
constituted proper predicate crimes for felony murder liability. Regarding the armed
robbery, the court noted that the evidence at trial indicated that Rivera "was
instrumental in planning the robbery, acquiring weapons, participating in the robbery,
and escaping with the robbery proceeds" and thus acted as a principal. *Rivera I*, slip
op. at 20-21. It also noted that

> [c]ontrary to defendant's argument, his co-conspirator co-defendants had not
> arrived at a "place of safety" when the defendant drove off in the Expedition – the
> crime was still in progress. In fact, defendant was aware that the robbery
> continued as he drove away.

*Id.* at 25. Regarding the hijacking offense, the court explained:

> Defendant was an integral part of the escape plan and aggravated vehicular
> hijacking was only one component of the overall robbery scheme concocted by
> defendant and co-defendants. Once defendant became aware that the money

17

was in the truck, defendant expeditiously hijacked the Expedition and drove away.  Thus, the hijacking became part-and-parcel of the overall robbery plan that included the murder of Frederick Jamison and defendant is accountable for the murder.

*Id.* at 21.

The appellate court's decision finding the evidence sufficient on the armed robbery felony murder charge was not contrary to or an unreasonable application of clearly established Supreme Court law.  The evidence at trial permitted a reasonable jury to find beyond a reasonable doubt that Rivera participated in the armed robbery as a principal, not merely as one accountable for the conduct of another.  The evidence also permitted a reasonable jury to find that the murder occurred during the course of his co-conspirators' escape.  Viewing the evidence in the light most favorable to the verdict, a rational jury could have found the essential elements of felony murder under Illinois law beyond a reasonable doubt.  The Court accordingly denies relief on this ground.

The Court need not address whether there was sufficient evidence to find Rivera guilty of felony murder based on the hijacking offense.  Notwithstanding the trial judge's entry of judgment for first degree murder on the hijacking offense alone, *see supra* at 11 n.1; *Rivera I*, slip op. at 33, Rivera does not dispute that the jury convicted him of felony murder based on the predicate armed robbery in addition to the hijacking.  The Court concludes that the armed robbery provided a sufficient basis for Rivera's first degree murder conviction.

**B.      Claims relating to Rickard's testimony**

Rivera contends that the trial court violated his confrontation and due process

18

rights in its rulings concerning Rickard's testimony.  Specifically, Rivera argues, the trial court erroneously compelled Rickard to testify, allowed the prosecution to introduce multiple prior inconsistent statements by Rickard, prevented the defense from conducting cross-examination and argument on Rickard's culpability and motives as a suspect, prevented the defense from disclosing to the jury that Rickard was testifying under threat of contempt sanctions, and allowed the prosecution to insinuate that Rivera had influenced Rickard's trial testimony.  According to Rivera, the cumulative impact of these errors violated his due process right to a fair trial.

### 1.    Rickard's compelled testimony

The Court first considers Rivera's contention that the trial court improperly forced Rickard to testify in violation of his Fifth Amendment right against self-incrimination. Rivera cannot obtain relief on this basis because he relies on the violation of the constitutional rights of someone other than himself.  *See Lopez v. Burke*, 413 F.2d 992, 994 (7th Cir. 1969) ("The privilege against self-incrimination is not violated when the information elicited is used not against the witness but against another."); *Fisher v. United States*, 425 U.S. 391, 397 (1976) ("The Court has held repeatedly that the Fifth Amendment is limited to prohibiting the use of physical or moral compulsion exerted on the person asserting the privilege.") (internal quotation marks and citations omitted). The Illinois Appellate Court correctly applied this rule, stating that a "criminal defendant lacks standing to object to the introduction of evidence that violates another person's Fifth Amendment rights."  *Rivera I*, slip op. at 28.  The appellate court's holding was therefore neither contrary to nor an unreasonable application of Supreme Court

precedent.

## 2. Introduction of multiple prior inconsistent statements

The Court turns next to Rivera's contention that the trial court erroneously allowed the prosecution to introduce two prior inconsistent statements by Rickard: a written statement and grand jury testimony. In both statements, Rickard allegedly described his and Rivera's respective roles in planning the armed robbery. At Rivera's trial, Rickard refused to confirm the content of the statements and testified that he could not recall what had happened. Rivera contends that the introduction of both statements improperly buttressed Rickard's earlier version of events through repetition, violating Illinois law and his confrontation rights.

On direct appeal, the Illinois Appellate Court held that Illinois law permitted the admission of the statements as substantive evidence and placed no limitation on the number of prior inconsistent statements admitted. *Rivera I*, slip op. at 32. Citing state law, the court also observed that "a key aspect to establishing the foundation for the admissibility of a prior inconsistent statement is the need to confront the witness *while on the witness stand* with that statement." *Id.* at 31 (quoting *People v. Grayson*, 321 Ill. App. 3d 397, 405, 747 N.E.2d 460, 468 (2001)) (emphasis in original). The Court held that the trial court properly admitted the statements because "the prosecutor gave Rickard the opportunity to testify according to his prior statements." *Rivera I*, slip op. at 32. The court did not acknowledge or address Rivera's constitutional claim.

This Court begins with Rivera's claim that the trial court's admission violated Illinois law. As the Court explained earlier, it "may not grant habeas relief under 28

U.S.C. § 2254 merely because a state court has misinterpreted or misapplied state law." *Lopez*, 594 F.3d at 587. Any error based on the state court's misapplication of Illinois law is therefore not cognizable on federal habeas corpus review.

The Court next considers Rivera's argument that the substantive admission of Rickard's prior inconsistent statements violated his confrontation rights. This Court reviews *de novo* a constitutional claim that the state court did not acknowledge and reach on the merits. *See, e.g.*, *Byers v. Basinger*, 610 F.3d 980, 989 n.6 (7th Cir. 2010); *Gonzales v. Mize*, 565 F.3d 373, 384-85 (7th Cir. 2009); *see also* 28 U.S.C. § 2254(d) (limiting AEDPA deference to "any claim that was adjudicated on the merits in State court proceedings."). Because the Illinois Appellate Court did not acknowledge the existence of Rivera's constitutional claim or address the standard in *Green*, the Court applies *de novo* review.

The Confrontation Clause guarantees a defendant the right "to be confronted with the witnesses against him," which includes the right to effective cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (citations and internal quotation marks omitted). The Supreme Court has held, however, that "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." *California v. Green*, 399 U.S. 149, 162 (1970); *see also Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.") (citation omitted). In *United States v. Owens*, 484 U.S. 554 (1988), the

Supreme Court held that the admission of a prior identification by a witness who could no longer remember the basis for the identification did not violate the Confrontation Clause. *Id.* at 564.

The Court need not address the merits of Rivera's confrontation claim, however, because any violation of his confrontation rights was harmless. *See, e.g.*, *Aleman v. Sternes*, 320 F.3d 687, 691 (7th Cir. 2003) (stating that, in a habeas case, "[u]nless its jurisdiction is at stake, a court may take up issues in whatever sequence seems best, given the nature of the parties' arguments and the interest in avoiding unnecessary constitutional decisions."); *Dittrich v. Woods*, 602 F. Supp. 2d 802, 809 (E.D. Mich. 2009) ("A federal district court on habeas review of a state court conviction can directly perform a harmless error analysis of a habeas petitioner's claims without first reviewing the merits of the claims, when it is in the interest of judicial economy and brevity to do so.") (citing *Porter v. Horn*, 276 F. Supp. 2d 278, 344 (E.D. Pa. 2003)); *Samuel v. Frank*, No. 03 C 1279, 2006 WL 3749904, at *9-10 (E.D. Wis. Dec 19, 2006) (same).

Confrontation Clause violations are subject to harmless error analysis. *United States v. Castelan*, 219 F.3d 690 (7th Cir. 2000). A Confrontation Clause violation is harmless if the prosecution presents overwhelming evidence of guilt at trial. *See, e.g.*, *Harrington v. California*, 395 U.S. 250, 253-54 (1969) (introduction of non-testifying co-defendant's confession was harmless given overwhelming evidence of guilt); *see also Schneble v. Florida*, 405 U.S. 427, 431 (1972) (introduction of inadmissible statements was harmless because it "at most tended to corroborate certain details of [defendant]'s comprehensive confession").

As in *Harrington*, Rivera faced overwhelming evidence of guilt at trial.  Four victims of the robbery testified and identified Rivera as one of the perpetrators.  Roderick Jamison testified that Rivera had entered the garage carrying an automatic weapon and yelled, "Police, freeze, everybody get down!"  Trial Tr. 360-61.  Presley identified Rivera in court as one of the gunmen, testifying that the gunmen had forced him to the ground and that Rivera had driven off in the Expedition.  *Id.* 525, 529.  Smith, who identified Rivera in a police lineup, testified that Rivera ran into the garage with the gunmen, pulled Brown and Stevenson out of the Expedition, and drove off in it.  *Id.* 612, 624.  Finally, Noel Munoz identified Rivera in a police lineup and corroborated the other victims' description of the robbery.  *Id.* 682-83.  Two additional victims, Stevenson and Brown, testified that a person armed with an automatic weapon forced them out of the Expedition and drove away in it, though they did not identify Rivera.

In addition to the eyewitness testimony, Chicago police officers George Tracy and James Adams and Assistant State's Attorney Tim Carter testified that shortly after his arrest, Rivera gave an oral statement in which he admitted his role in planning and executing the robbery.  Chicago police officer James Hennigan testified that Rivera had admitted to him that a Baretta handgun recovered during the investigation had been in Rivera's possession during the robbery.  *Id.* 1322-23.  Taken together, this testimony provided overwhelming evidence of guilt.  Rickard's testimony and statements at most tended to corroborate the details in Rivera's comprehensive confession.  Any violation of Rivera's confrontation rights was therefore harmless.

**3.      Limitations on cross-examination and argument**

Rivera next contends that the trial court violated his confrontation rights when it prevented him from eliciting testimony on Rickard's culpability and bias because he was accountable for the murder or at least considered himself to be an accomplice; from arguing that he had an incentive to shift blame to Rivera; and from disclosing to the jury that Rickard was testifying under threat of a contempt sanction.

The Illinois Appellate Court rejected these claims.  It concluded first that Rickard had withdrawn from the offense and thus was not accountable for the murder:

> In the present case, Rickard informed defendant and Taylor on two separate occasions that he would not be able to participate in the robbery as the getaway driver because he had a prior commitment.  The record shows that Rickard terminated his effort to facilitate the crime and deprived his prior efforts of effectiveness.  Therefore, Rickard withdrew his participation . . . .

*Rivera I*, slip op. at 29.  The appellate court also found that Rivera had a sufficient opportunity to challenge Rickard's veracity on cross-examination:

> [T]he record shows that defendant had ample opportunity to cross-examine Rickard after direct examination.  Moreover, the jury heard enough testimony to determine Rickard's credibility including Rickard's testimony that he was not appearing voluntarily in court; that he was scared about being charged with armed robbery and first degree murder; and that he signed his statement because he felt threatened by the police and the assistant states [sic] attorney.

*Id.* at 29-30.

The Court need not address whether the state court unreasonably applied the Supreme Court's decisions, because any violation of Rivera's confrontation rights was harmless.  First, as the appellate court observed, the jury heard some testimony regarding Rickard's potential bias and motive to falsely implicate Rivera.  More importantly, however, as the Court has explained, Rivera's confession coupled with the

testimony of the victims amounted to overwhelming evidence of guilt.  Any error was therefore harmless.

## 4.    Improper closing argument

Rivera next argues that the trial court violated his due process rights when it allowed the prosecution to insinuate that Rivera's presence had influenced Rickard's trial testimony.  In closing argument, the prosecution emphasized Rivera's confession and the witness testimony implicating him.  To explain Rickard's trial testimony, the prosecution argued that "[t]he defendant wasn't present when [Rickard] gave the statement, ladies and gentlemen. . . . Your common sense tells you that [Rickard] doesn't want to hurt his friend.  He realizes that he did, but he told the truth in the statement originally."  Trial Tr. 1418-19.  In rebuttal, the prosecution repeated that "[Rickard] lied because his friend is looking at him. . . . His friend wasn't there before.  So he came in here and said I don't remember."  *Id.* 1471.

The Illinois Appellate Court concluded that no error occurred, stating:

We agree with the State that the prosecutor was required to explain the inconsistency to the jury and that, anything, the inconsistency negatively impacted the State's case because Rickard was the State's witness.  Defendant was not prejudiced by Rickard's testimony.

*Rivera I*, slip op. at 30.

A prosecutor's improper remarks rise to the level of a due process violation when they "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  No due process violation occurs when the prosecutor's remarks are merely "undesirable or even universally condemned."  *Id.* (citation and internal quotation marks omitted).  Any error

25

regarding improper prosecutorial remarks is harmless if it did not have a "substantial and injurious result" on the jury's verdict. *See, e.g.*, *Aleman*, 320 F.3d at 691 (denying relief on the basis that the "fleeting argument" in question "was so peripheral to th[e] trial that no substantial and injurious result came to pass").

The Court need not address whether the state court unreasonably applied the Supreme Court's decisions, because any violation of Rivera's confrontation rights was harmless. The prosecutors' comments attributing Rickard's change of testimony to his loyalty to Rivera did not have a substantial or injurious impact on the jury's verdict. As in *Aleman*, the remarks were fleeting and peripheral. In light of the overwhelming evidence of guilt, any improper remarks made during closing argument were harmless.

**5.      Cumulative error**

The Court turns last to Rivera's cumulative error argument.   "'Cumulative errors, while individually harmless, when taken together can prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law.'" *United States v. Isaacs*, 593 F.3d 517 (7th Cir. 2010) (quoting *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001)). "To demonstrate cumulative error, [a petitioner] must establish that '(1) at least two errors were committed in the course of the trial; (2) considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial.'" *Allen*, 269 F.3d at 847 (quoting *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000)). Such errors are also subject to harmless error review, such that this Court may only grant habeas relief if "the effect of the errors, considered together, could not have been harmless, or

[p]ut another way, . . . that but for the errors, the outcome of the trial probably would have been different." *Allen*, 269 F.3d at 827 (citation and internal quotation marks omitted).

Rivera has not demonstrated that any errors concerning Rickard's testimony were collectively so prejudicial that they compromised his right to a fundamentally fair trial. Rickard's grand jury and written statements were far from the only evidence implicating Rivera in the crimes. As the Court has explained, four victims identified Rivera either in court or in police lineups and testified to his role in the crimes. Two police officers and an Assistant State's Attorney testified that Rivera had confessed to them and a third police officer testified that Rivera had admitted to possessing the Baretta handgun recovered during the investigation. Rickard's grand jury and written statements at most tended to corroborate details already revealed in Rivera's comprehensive confession. In light of the overwhelming evidence of Rivera's guilt, any cumulative error regarding Rickard's testimony was harmless.

## C.     "Post-conviction claims"

Rivera voluntarily dismissed from his petition his last two claims, which he characterized as his "post-conviction claims." In these claims, Rivera alleged ineffective assistance of counsel on various grounds and challenged his conviction and sentence as inconsistent with those of his co-defendants. Because Rivera voluntarily dropped these claims, *see* Order of Feb. 24, 2010, the Court need not address them.

## D.     Certificate of appealability

When a district court enters a final judgment adverse to a habeas petitioner, it

must issue or deny a certificate of appealability (COA).  Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.  To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A petitioner satisfies this standard if he demonstrates that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

The Court has some doubts regarding the federal constitutional merit of the state appellate court's rulings on Rivera's claims relating to Rickard's testimony, the limitations on his cross-examination, and the prosecution's argument about that testimony.  But the Court has no doubt that these errors were harmless and does not believe that is a reasonably debatable issue.  Because the harmless error finding undermines these claims, the Court declines to issue a COA concerning them.  Rivera's other claims likewise do not rise to the level of potential merit necessary to merit issuance of a COA.

## Conclusion

For the reasons stated above, the Court denies Rivera's petition for a writ of habeas corpus and his request for an evidentiary hearing.  The Court declines to issue a certificate of appealability.  The Clerk is directed to enter judgment in favor of the respondent.

MATTHEW F. KENNELLY
United States District Judge

Date:  February 22, 2011

28